IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHARLES DEAN HANEY,                *
Individually, and as Personal
Representative of the Estate of    *
Charles Ambrose Haney, et al.,
                                   *
            Plaintiffs
                                   *
        vs.                            CIVIL ACTION NO. MJG-12-1396
                                   *
3M COMPANY, et al.,
                                   *
            Defendants
                                   *

*       *       *       *       *       *       *       *       *

MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT [HOPEMAN]

The Court has before it Motion of Defendant Hopeman

Brothers, Inc. ("Hopeman"), for Summary Judgment [ECF No. 849],

and the materials submitted relating thereto.  The Court finds a

hearing unnecessary.


I.   BACKGROUND

On February 8, 2012, Charlie Ambrose Haney ("Haney") filed

the instant lawsuit in the Circuit Court for Baltimore City,

Maryland against eighty-four Defendants (one of which was

Hopeman) alleging damages due to exposure to asbestos.  On May

8, 2012, the case was removed to this Court based upon the

federal officer removal provision, 28 U.S.C. § 1442(a)(1).

Haney died on July 1, 2012 from malignant mesothelioma

caused by exposure to asbestos.  On October 13, 2013, Plaintiffs

Charles Dean Haney, individually and as personal representative of the Estate of Haney, Jeffrey William Haney, and John Henry Haney (collectively "Plaintiffs"), filed the First Amended Complaint ("FAC") against fifty-six Defendants (one of which was Defendant Hopeman Brothers, Inc.), asserting claims in five Counts:

| | |
|---|---|
| Count I | Strict Liability |
| Count II | Breach of Warranty |
| Count III | Negligence |
| Count IV | Aiding and Abetting and Conspiracy |
| Count V | Wrongful Death |

By the instant Motion, Defendant Hopeman Brothers, Inc. ("Hopeman") seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  The Court may look at the evidence presented in regard to a motion

for summary judgment through the non-movant's rose-colored
glasses, but must view it realistically.  After so doing, the
essential question is whether a reasonable fact finder could
return a verdict for the non-movant or whether the movant would,
at trial, be entitled to judgment as a matter of law.  See,
e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986);
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);
Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).

     Thus, in order "[t]o defeat a motion for summary judgment,
the party opposing the motion must present evidence of specific
facts from which the finder of fact could reasonably find for
him or her." Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md.
1999) (emphasis added).  However, "self-serving, conclusory, and
uncorroborated statements are insufficient to create a genuine
issue of material fact."  Int'l Waste Indus. Corp. v. Cape
Envtl. Mgmt., Inc., 988 F. Supp. 2d 542, 558 n.11 (D. Md. 2013);
see also Wadley v. Park at Landmark, LP, 264 F. App'x 279, 281
(4th Cir. 2008).

     When evaluating a motion for summary judgment, the Court
must bear in mind that the "[s]ummary judgment procedure is
properly regarded not as a disfavored procedural shortcut, but
rather as an integral part of the Federal Rules as a whole,
which are designed 'to secure the just, speedy and inexpensive

determination of every action.'" <u>Celotex</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).


III. <u>BREACH OF WARRANTY, AIDING AND ABETTING, PUNITIVE DAMAGES</u>

In the FAC, Plaintiffs present claims for Breach of Warranty (Count II) and Aiding and Abetting and Conspiracy (Count IV).  FAC ¶¶ 10-14, 21-26.  Plaintiffs also seek punitive damages in the amount of $50,000,000.00.  <u>See, e.g., id.</u> at 16.

Hopeman contends that it is entitled to summary judgment on Plaintiffs' claims for breach of warranty, aiding and abetting, and punitive damages because:

> Plaintiffs failed to establish clear and convincing evidence of actual malice to support their claim for punitive damages;
>
> Plaintiffs' breach of warranty claim is barred by the statute of limitations and for lack of privity; and
>
> There is no evidence to support a claim for aiding and abetting a conspiracy.

[ECF No. 849-1] at 10-15.

In their Response to the instant Motion, Plaintiffs do not address these contentions.  Plaintiffs' failure to respond to Hopeman's summary judgment assertions regarding the claims for breach of warranty, aiding and abetting, and punitive damages constitutes abandonment of those claims.  <u>See Johnson v. Norfolk S. Ry. Co.</u>, No. CIV.A. MJG-12-3374, 2014 WL 4662384, at *2 (D.

Md. Sept. 16, 2014) (citing cases); see also Grant-Fletcher v. McMullen & Drury, P.A., 964 F. Supp. 2d 514, 525 (D. Md. 2013) ("Fletcher appears to have abandoned this argument by not opposing M & D's Motion for Summary Judgment on the issue.").

Accordingly, the Court concludes[1] that Hopeman is entitled to summary judgment as a matter of law on Counts II and IV and on Plaintiffs' claim for punitive damages.

IV.  NEGLIGENCE AND STRICT LIABILITY

Hopeman contends that Plaintiffs have failed to present sufficient evidence to permit a reasonable jury to find that Haney was exposed to asbestos from any product for which Hopeman is liable to the extent that the exposure was a substantial factor in causing Haney's mesothelioma.

In their Response, Plaintiffs state generally that "Haney was exposed to asbestos . . . while working as a machinist

---

[1]  See Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) ("[P]laintiff failed to respond to the defendants' motion for summary judgment, despite repeated notices to do so. This failure to respond, however, does not fulfill the burdens imposed on moving parties by Rule 56. . . . Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to "a judgment as a matter of law."  The failure to respond to the motion does not automatically accomplish this. Thus, the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.").

during the new construction of naval and merchant ships at the

Bethlehem Steel Sparrows Point Shipyard." [ECF No. 937] at 2.

Specifically, as to Hopeman, Plaintiffs state:

> From July of 1956 to the spring of 1958, Mr.
> Haney was employed as an outside machinist
> by the Bethlehem Steel Sparrows Point
> Shipyard.  It is at that jobsite that Mr.
> Haney claims exposure to the asbestos-
> containing bulkhead (wall) panels that
> Hopeman admittedly installed onboard the ore
> carrier.

Id. at 2-3 (internal citation omitted).

Accordingly, the claims against Hopeman are based solely upon

alleged exposure to asbestos in Marinite panels installed by

Hopeman on the ore carrier Hull No. 4549 ("the 4549") in 1956.


A.    Exposure to Asbestos-Containing Marinite Panels

Hopeman states that it "has not and does not contest that

it installed Marinite panels on" the 4549. [ECF No. 938] at 1.

However, Hopeman contends that "Hopeman's documents show that it

installed insulation as well, and that, based on the testimony

of Mr. Haney, is the only material he observed Hopeman install"

and, therefore, "[i]n the absence of proof that this was an

asbestos-containing product, Hopeman is entitled to summary

judgment." [ECF No. 849] at 9-10.

Hopeman installed the asbestos-containing Marinite panels

on the bulkhead – or, interior - walls in the hull of the 4549.

Ramsey Dep. 23:7-24:14.  The proffered evidence referring to Haney's alleged exposure to the installation of Marinite panels on the 4549 is provided by deposition testimony from Haney.

> Q. [By Plaintiffs' counsel]: During this six-month period when you were working at Beth Steel from the summer until December of 1956 – and you have told us you worked on all the ships that were in the wet dock in the engine and boiler room.
> . . . .
> Q. Do you recollect any – any contractors or outside workers installing walls or paneling?
> A. Putting up – putting up bulkheads, a sheet – sheeting over the, like, insulation.
> Q. And when those workers were installing that paneling on the bulkheads do you recall them having to saw those panels when you were work – walking through that vicinity?
> A. Yes.  You had to cut them to fit.

Haney Disc. Dep. May 10, 2012, 442:4-8, 443:2-16 (objections to form omitted).

Later that day, there was questioning by counsel for Hopeman:

> Q. Okay.  The – the panels that were installed on the bulkheads, do you know what that panel material looked like?
> A. It is blackish on the outside.  On the inside it was kind of a grayish
> . . . .
> Q. Can you tell me how the panel material would be installed on the bulkhead?
> A. They would measure it and cut it where it would fit the bulkhead.

Id. 456:1-457:2.

> Q.  Were there – were these panels – they fit
>     on the wall, correct?
> A.  Yes.
> Q.  How were they fastened to the wall?
> A.  They had these nail guns – excuse me.
>     They had these nails with a sheet metal
>     around it.   And they could take it in
>     through – through all this panel we are
>     talking about.
> Q.  Yes, sir.
> A.  And could hit it with an arc and it would
>     bond.  I mean, that would secure it right
>     up against the bulkhead.
> Q.  And the arc was some type of weld; is
>     that right?
> A.  That's what it is.

Id. 459:3-18.

In his de bene esse deposition,[2] held on May 24, 2012, Haney

was again questioned about the installation of bulkhead panels:

> Q.  [By Plaintiffs' counsel]: What kind of
>     work did you see contractors doing when
>     you would walk from the dock to get to
>     the engine room?
> A.  They was putting up the drywall on the
>     bulk heads.
> Q.  Can you describe –
> A.  Dry dock.
> Q.  You said drywall.
> A.  Well,  drywall  putting  it  on  the  bulk
>     heads.

---

[2]   The United States Court of Appeals for the Fourth Circuit
has stated that "[t]he Federal Rules of Civil Procedure make no
distinction for use of a deposition at trial between one taken
for discovery purposes and one taken for use at trial (de bene
esse)."  Tatman v. Collins, 938 F.2d 509, 510-11 (4th Cir.
1991).  The court explained that "Fed.R.Civ.P. 32 provides that
a deposition may be offered at trial, subject to the rules of
evidence, as though the witness were present and testifying
. . . . It is irrelevant . . . that [the deposition] was
initiated only for discovery purposes, or that it was taken
before other discovery was completed."  Id. at 511.

> Q. It was like –
> A. Sheets of it.
> Q. Okay.
> A. Like eight by ten, et cetera, et cetera.
> Q. All right. And you – can you describe how they were putting those panels up on the walls?
> Q. What kind of work were they doing?
> A. They were – they were putting on the insulation.
> Q. All right. But when you – you said they were putting these panels up, how were they doing that?
> A. They were putting it up on the walls, bulk heads. And they had these little pock things they would shoot at it like a nail, fuse them right in like a nail sticking out. And you got is the insulation in behind it, and secure it right down.
> Q. And when they were putting these panels up on the wall was it always a perfect fit?
> A. No.
> Q. Or did they ever have to cut it?
> A. They were cutting it left and right.
> Q. How were they cutting it left and right?
> A. With saws – saws, electric saws, pneumatic saws.

Haney De Bene Esse Dep. May 24, 2012, 62:2-64:9 (objections to form and compound omitted).

Later that day, questioning by counsel for Hopeman:

> Q. And you said these panels were blackish color on the outside?
> A. Right.
> Q. And a grayish color on the inside?
> A. Yes.

Id. 178:11-15.

Hopeman contends that "Mr. Haney's description of the [paneling] material and how it was installed is inconsistent

9

with the Marinite panels installed on [the 4549]." [ECF No. 938] at 1. Hopeman points to the 1995 trial testimony of Charles Johnson, a Hopeman employee, who discussed installing comfort insulation in the hull of ships before installing the divisional paneling system. See [ECF No. 849-10]. Hopeman also relies upon the 1996 deposition testimony of Otis Craun and Park Gardner, former Hopeman employees who installed divisional partitioning panels and bulkhead panels on ships at the Sparrows Point Shipyard. See [ECF Nos. 849-8, 849-9]. According to Hopeman, this testimony, when compared with Haney's, establishes that "[t]he material described by Mr. Haney is clearly this comfort insulation, and not a Marinite board." [ECF No. 849-1] at 9.

Haney's deposition testimony is far from conclusive on what he observed. At one point, he described observing "drywall [being] put[] on the bulk heads," and then, at another point, he described seeing workers "put[] up insulation." However, Hopeman mischaracterizes the deposition and trial testimony of its former employees, which it contends shows that the process for installing Marinite panels was "entirely different" from what Haney described. See [ECF 938] at 5.

Based on the evidence in the record, the Court cannot conclude that no reasonable jury could find that Haney observed the installation of asbestos-containing Marinite panels on the

4549.  Accordingly, Hopeman is not entitled to summary judgment on this ground.


B.   Substantial Factor Causation

However, even if Haney had been exposed to the installation of Marinite panels by Hopeman, Hopeman is entitled to summary judgment because Plaintiffs have not provided sufficient evidence for a jury to reasonably infer that Haney's exposure to the panels was a substantial factor in causing his mesothelioma.

In Maryland, "to prevail on claims of negligence or products liability, the plaintiff must prove proximate causation."  Hurley v. Anchor Packing Co., No. CIV.A. GLR-12-460, 2014 WL 1794116, at *2 (D. Md. May 5, 2014), appeal docketed, No. 14-2271 (4th Cir. 2014).  "To establish proximate causation in Maryland, the plaintiff must introduce evidence which allows the jury to reasonably conclude that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result."  Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1161-62 (4th Cir. 1986).  Although proximate cause is generally an issue "reserved for the trier of fact[,] 'it becomes a question of law in cases where reasoning minds cannot differ'" and "'the facts admit of but one inference.'"  Pittway Corp. v. Collins, 973 A.2d 771, 792 (Md. 2009) (citations omitted).

11

1.   The Proffered Evidence

The only proffered evidence regarding the extent of Haney's exposure to the installation of Marinite panels on the 4549 by Hopeman[3] is provided by deposition testimony from Haney.

> Q. [By Plaintiffs' counsel]: During this six-month period when you were working at Beth Steel from the summer until December of 1956 – and you have told us you worked on all the ships that were in the wet dock in the engine and boiler room.  When you would get on the ship, did you have to walk through companionways and other compartments to get to the engine and the boiler room?
>
> A. Yes.
>
> Q. And when you would walk through the companionways and the compartments to make your way down to the engine room was – was there work going on?
>
> A. Yes, there were.
>
> Q. Do you recollect any – any contractors or outside workers installing walls or paneling?
>
> A. Putting up – putting up bulkheads, a sheet – sheeting over the, like, insulation.
>
> . . . .
>
> Q. All right.  And when they would consult these panels to fit was – what was the condition of the air like in those companionways and compartments that you were walking through?
>
> A. A little dusty.
>
> Q. Okay. And did you breathe that dust?

---

[3]    Haney could not recall the name of the manufacturer of the panels or the company that installed them, but Hopeman has "admit[ted], at least for purposes of this motion, that it in fact did install Marinite panels during the course of its work on Hull 4549 during September and October, 1956." [ECF No. 849-1] at 9-10.

A.  Yes, until I got through it.

Haney Disc. Dep. May 10, 2012, 442:4-444:8 (internal objections

to form omitted).

Later that day, there was questioning by counsel for

Hopeman:

> Q.  [E]xplain to me how it is that you would
>     get down to the engine room.
> A.  I – I'd come off the main deck.
> Q.  Right
> A.  Down through the hatch.
>  . . . .
> A.  Two – two main ladders going down to the
>     engine room.
>  . . . .
> Q.  How long would it take you to get from
>     the deck of the ship when you got on the
>     ship from the land to get down to the
>     engine room?
> A.  This is a lot of ifs and ands there.
>  . . . .
> Q.  I know.  Well, just tell me on average
>     how – how long it would take you.  I
>     understand that.
>  . . . .
> A.  I mean with – with – with – it is
>     according to what you are carrying.
> Q.  What would you be carrying when you were
>     going down –
> A.  Tool pouches.  A tool pouch.
>  . . . .
> Q.  I just want to know how much time it would
>     take you to get down there.  And I
>     understand it would vary a little bit but –
> A.  Three to five minutes.

Id. 448:15-449:3, 449:16-450:2, 450:16-451:8, 451:17-20.  Haney

later reiterated that it took him three to five minutes to get

to the engine room: "I am three to five minutes getting me down

to the engine room."  Id. 461:18-20.

During further questioning by counsel for Hopeman:

> Q. Okay.  During the period of time until December 1956 at the shipyard are you able to tell me how many times you saw the paneling material installed aboard ship?
> A. Eight or ten times.
> Q. Okay.  Eight to ten times?
> A. Eight to ten somewhere.

Id. 466:10-16.

In his de bene esse deposition, Haney was again questioned about his work on the 4549:

> Q. (by Plaintiff's counsel): Now, when you were working on the ore carrier in the engine room, how much do you think you worked on that ore carrier in the engine room during that six-month period at Beth Steel?
> A. Maybe a month or better.
> Q. And each day that you worked on that ore carrier in 1956 at Beth Steel, on any given day, how many times do you think you had to go from the engine room back to the dock?
> A. Six times, a dozen.
> . . . .
> Q. Each time you would go back and forth from the engine room back to the dock, did you have to pass through the areas on the ship where those contractors –
> A. Yep.
> Q. – were putting up the walls?
> A. Right.

Haney De Bene Esse Dep. May 24, 2012, 65:2-66:6 (objections omitted).

However, later that afternoon, there was additional questioning by counsel for Hopeman:

14

Q. When you were working at Sparrows Point, you told me when I was asking you questions that to get from the deck when you were on land to the ship down to the engine room and boiler room where you were stationed, it took you about three to five minutes to make that trip. That's true, correct?

A. True.

Q. All right. And you told me that from when you started at Bethlehem Steel Sparrows Point shipyard in June of (sic) July of '58 (sic) until the end of that year in December, that you saw panels being cut while you were making that trek passing through the area about eight to ten times. That is true, correct?

A. Correct.

Id. 177:16-178:10.


2.  Causation Analysis

Haney is considered a "bystander" because he did not work directly with the Marinite panels. See Eagle-Picher Indus., Inc. v. Balbos, 604 A.2d 445, 460 (Md. 1992). "The Court of Appeals of Maryland has established a 'frequency, regularity, proximity' test for substantial factor causation in [bystander] asbestos-exposure cases." Hurley, 2014 WL 1794116, at *2. In Eagle-Picher Industries, Inc. v. Balbos, the Court of Appeals explained:

> Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. . . . [T]he factors to be evaluated include the nature of the

product, the <u>frequency</u> of its use, the <u>proximity</u>, in distance and in time, of a plaintiff to the use of a product, and the <u>regularity</u> of the exposure of that plaintiff to the use of that product. "In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease."

604 A.2d at 460 (emphasis added) (citations omitted).

"To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." <u>Lohrmann</u>, 782 F.2d at 1162-63. Plaintiffs have not met this burden.

Haney testified at two different points during his discovery and <u>de bene esse</u> depositions that he observed the installation of paneling "eight to ten times" while he took the three- to five-minute-walk from the main deck to the engine and boiler room. <u>See</u> Haney Disc. Dep. May 10, 2012, 461:18-20, 466:10-16; Haney <u>De Bene Esse</u> Dep. May 24, 2012, 177:16-178:10. The duration of the exposure while Haney worked on the 4549 was no more than six months (between July and December of 1956), and, in fact, according to Haney, was closer to "a month or better." Haney <u>De Bene Esse</u> Dep. May 24, 2012, 65:2-66:6.

Moreover, it is not clear that the "eight to ten times" Haney observed the installation of the Marinite panels all

16

occurred while he was working on the 4549. <u>See</u> Haney Disc. Dep. May 10, 2012, 466:18-467:17 (Q. I know you were working on different ships. How much time would you spend on any particular ship at Sparrows Point until December of 1956? . . . . Did you work on the same ship for some period of time?   A. No. Day to day."); Haney <u>De Bene Esse</u> Dep. May 24, 2012, 177:16-178:10 ("Q. [U] you told me that from when you started at Bethlehem Steel Sparrows Point shipyard in June of (<u>sic</u>) July of '58 (<u>sic</u>) until the end of that year in December, that you saw panels being cut while you were making that trek passing through the area about eight to ten times.  That is true, correct?   A. Correct.").

Haney's exposure to the installation of Marinite panels on the 4549 was significantly less frequent, proximate, and regular than the exposures that courts in Maryland have found adequate to satisfy the <u>Balbos</u> "frequency, proximity, and regularity" test.  <u>See</u>, <u>e.g.</u>, <u>Sherin v. Crane-Houdaille, Inc.</u>, 47 F. Supp. 3d 280, 295 (D. Md. 2014) ("Mr. Sherin has provided sufficient evidence for a jury to reasonably infer that the <u>Balbos</u> 'regular, frequent, and proximate exposure' test is met. . . . Defining the relevant time period as 1969 to 1976, and performing basic math, Mr. Sherin visited between 672 and 840 construction sites during that time. . . .  Dust from the joint compound adhered to his socks, shoes, pants, and jacket that were washed by Mrs. Sherin. . . . From Mrs. Sherin's laundry

exposure and the medical testimony, a jury could reasonably
infer that Union Carbide's asbestos fiber was a substantial
factor in causing Mrs. Sherin's mesothelioma." (internal
citations and footnotes omitted)); ACandS, Inc. v. Godwin, 667
A.2d 116, 124-126 (Md. 1995), on reconsideration (Dec. 1, 1995)
("For more than twenty years McNiel worked outside the partially
open-sided No. 4 Open Hearth building and was required to enter
it five to six times a day. He was also required from time to
time for more than two decades to go to No. 5 Soaking Pit. Based
on the evidence that Bethlehem employees regularly used
Unibestos half-rounds and block, McNiel has satisfied the Balbos
test as to PCC. . . . [T]he evidence places Russell at the Point
doing pipe covering work for twelve to fourteen months while
Unibestos was available to Bethlehem pipe coverers. Further,
pipe coverers employed by Bethlehem were 'always' around when
Russell was working for a contractor. . . . There was sufficient
evidence of substantial causation to take the case to the jury
on behalf of Russell against PCC. . . . The Leaf brothers worked
on the No. 5 Blast Furnace outage for a shift of twelve hours in
a twenty-four hour period, seven days each week, for six
consecutive weeks. Thus, there was sufficient evidence that the
plaintiff Leaf was regularly and proximately exposed to
Unibestos, which was frequently used.").

The evidence establishes that, at most, Haney passed through the areas where Hopeman installed the Marinite panels on the 4549 eight to ten times for three to five minutes each time over the course of roughly two months.  According to the Court of Special Appeals of Maryland, this is not sufficient to satisfy the substantial factor causation standard for asbestos exposure cases.  See Anchor Packing Co. v. Grimshaw, 692 A.2d 5, 40 (Md. Ct. Spec. App. 1997) ("As far as Zumas's exposure to Hopeman's cutting of panels on board ships in the wet dock area, there is no direct evidence that Zumas worked in proximity, regularity, or frequency to Hopeman's operations. Zumas testified that he would pass through the quarters to get to his work area, but he did not work inside the quarters. . . . The facts . . . do not establish Zumas's proximity, frequency, or regularity of exposure."), vacated sub nom. on other grounds Porter Hayden Co. v. Bullinger, 713 A.2d 962 (Md. 1998) abrogated on other grounds by John Crane, Inc. v. Scribner, 800 A.2d 727 (Md. 2002).

Plaintiffs contend that Haney's deposition testimony establishes that he observed the installation of Marinite panels "six times, a dozen" times per day.  [ECF 937] at 4.  However, Haney did not provide such testimony.  Moreover, Haney's attorney – with ample opportunity to do so – did not in any way seek to reconcile that testimony with Haney's clear statements –

made during both his discovery and de bene esse depositions –
that he saw panels being cut and installed on the 4549 only
"eight to ten" times.

The Court finds that Plaintiffs have not presented evidence
sufficient to permit a reasonable jury to conclude that Haney
was exposed to the installation of Marinite panels on the 4549
with the frequency, proximity, and regularity necessary to hold
Hopeman liable for Haney's mesothelioma.

Accordingly, Hopeman is entitled to summary judgment on
Plaintiffs' claims for strict liability and negligence.[4]

---

[4]   The Court has found that Hopeman is entitled to summary
judgment on Plaintiffs' strict liability and negligence claims
on the grounds that Haney's exposure to the installation of the
asbestos-containing Marinite panels was not a substantial factor
in causing his mesothelioma.  Therefore, Hopeman also is
entitled to summary judgment on Plaintiffs' wrongful death
claims  because there has been no "wrongful act."  See Md. Code
Ann., Cts. & Jud. Proc. §§ 3-901, 3-902.

V.    <u>CONCLUSION</u>

For the foregoing reasons:

    1. The Motion of Defendant Hopeman Brothers, Inc., for
       Summary Judgment [ECF No. 849] is GRANTED.

    2. The Cross-Claim of Hopeman Brothers, Inc., Against
       Defendant Owens Illinois, Inc. [ECF No. 687] is
       DISMISSED AS MOOT.

    3. Judgment shall be entered by separate Order.


SO ORDERED, on <u>Monday, August 10, 2015</u>.


                              _____/s/___    ___ _____
                                    Marvin J. Garbis
                              United States District Judge